## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Chesapeake Energy Corporation, | |
| Plaintiff, | |
| v. | Case No. CIV-20-934-J |
| The United States of America, | |
| Defendant. | |

## PLAINTIFF CHESAPEAKE ENERGY COPORATION'S MOTION FOR SUMMARY JUDGMENT & BRIEF IN SUPPORT

Richard A. Husseini, *pro hac vice*
KIRKLAND & ELLIS LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3457
Facsimile: (713) 836-3601
Email: richard.husseini@kirkland.com

–and–

Reagan E. Bradford, OBA #22072
Ryan K. Wilson, OBA #33306
BRADFORD & WILSON PLLC
431 W. Main Street, Suite D
Oklahoma City, OK 73102
Telephone: (405) 698-2770
Facsimile: (405) 234-5506
reagan@bradwil.com
ryan@bradwil.com

**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

Table of Contents..................................................................................................... i

Table of Authorities ............................................................................................... iii

Exhibit List ............................................................................................................. v

Introduction ............................................................................................................ 1

Undisputed Material Facts ...................................................................................... 2

Legal Standard ........................................................................................................ 6

Argument & Authority ........................................................................................... 6

   1.  Two Tax Issues in Dispute in the IRS Audit .................................................. 7

   2.  Legal Authority Supporting Chesapeake's Position ...................................... 8

      a.  Normal Tax Rules Before Considering the Effect
         of the Stimulus Provision ...................................................................... 9

      b.  The Stimulus Provision Ordering Rule ................................................. 11

      c.  Interest Under 26 U.S.C. § 6601 ........................................................... 14

   3.  The Parties' Settlement of the ATNOL Issue ............................................... 15

   4.  The Plain Language of the Settlement Documents Sets Forth
      that the Parties Agreed Only to a Single Deficiency and
      Interest Thereon ............................................................................................ 18

   5.  The IRS's Interest Calculations Are Not Permissible
      Under Either Statute or the Terms of the Settlement Documents ......................... 21

      a.  The Parties Agreed to Use Restricted Interest Because
         Using the General Interest Rules Was Not Possible Given
         the Nature of the Settlement .................................................................. 21

      b.  The Obvious Conflict Between the IRS's Improper Interest
         Calculation Construct and Either Chesapeake's Methodology
         or the IRS's Methodology Serves as Further Evidence that the
         IRS's Interest Calculation is Improper .................................................. 24

      c.  The Schedules in the Form 3610 Alone are Plainly Insufficient
         to Calculate Interest Under Even the IRS's Improper Interest
         Calculation Construct ........................................................................... 29

      d.  Chesapeake's Significant Concessions are Further Evidence
         of the Parties' Agreement of a Single Deficiency Amount with
         Interest on the Deficiency Amount and Finality for the Stimulus
         Provision Ordering Rule ....................................................................... 29

Conclusion ................................................................................................................ 30

Certificate of Service ............................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Browning v. Comm'r*,
    55 T.C.M. (CCH) 1232 (1988) .................................................................... 22

*Curtin v. United Airlines, Inc.*,
    275 F.3d 88 (D.C. Cir. 2001) ..................................................................... 23

*Estate of Shapiro v. Comm'r*,
    111 F.3d 1010 (2d Cir. 1997) ................................................................... 22

*Pub. Serv. Co. of Okla. v. Burlington N. R. Co.*,
    53 F.3d 1090 (10th Cir. 1995) .................................................................... 6

*U.S. v. ConocoPhillips Co.*,
    744 F.3d 1199 (10th Cir. 2014) ................................................................ 18

*U.S. v. Nat'l Steel Corp.*,
    75 F.3d 1146 (7th Cir. 1996) .................................................................... 18

**Statutes**

26 U.S.C. § 56 ...................................................................... 4, 9, 10–13, 15, 22

26 U.S.C. § 57 ................................................................................................ 2–3

26 U.S.C. § 61 ................................................................................................. 10

26 U.S.C. § 161 ............................................................................................... 10

26 U.S.C. § 162 ............................................................................................... 10

26 U.S.C. § 172 ................................................................... 3, 10–13, 25–27

26 U.S.C. § 6012 ............................................................................................. 10

26 U.S.C. § 6601 ................................................................................ 14, 21–24

26 U.S.C. § 7121 ............................................................................................. 18

**Legislation**

Worker, Homeownership, and Business Assistance Act of 2009,
    Pub. L. No. 111-92, 123 Stat. 2984 (November 6, 2009) ...................... 3, 9

2017 Tax Cuts and Jobs Act,
    Pub. L. No. 115-97, § 12001 ...................................................................... 9

**Rules**

FED. R. CIV. P. 56 .............................................................................................. 6

**Other**

Internal Revenue Manual Section 4.75.13.8.13 .................................................................. 22

Internal Revenue Manual Section 8.17.6.1 ...................................................................... 22

IRS Form 1040 ...................................................................................................... 10

IRS Form 1040 Instructions .......................................................................................... 10

Restatement (Second) of Contracts § 203 ....................................................................... 23

Rev. Proc. 60-17, 1960-2 C.B. 942 .................................................................................. 22

# EXHIBIT LIST

1. Closing Agreement
2. Form 870-AD
3. Shaw Declaration
4. Form 3610
5. AMT Basic Operation Example
6. Stimulus ATNOL Example
7. ATNOL Absorption Mechanics Example

This case arises from a tax dispute between Chesapeake and the IRS for the tax years 2010–13.[1] After much negotiation and a formal mediation process, Chesapeake and the IRS agreed to mutually resolve these tax issues.

This resolution is documented and, like most settlements, it went Chesapeake's way on some aspects and the IRS's way on others. As part of the compromise, the IRS agreed that Chesapeake would only owe a single tax deficiency of $7,466,599 (the "Deficiency") for the tax year 2012 (but no deficiency for 2010, 2012, 2013), plus interest *on the Deficiency*. Chesapeake held up its end of the agreement and promptly paid the Deficiency, plus interest on the Deficiency in the amount of $1,387,974, for a total payment of $8,854,573 to resolve the dispute.

But the IRS didn't hold up its end: just a short time later, the IRS sent Chesapeake assessments of even more interest, ultimately totaling $12,644,769 *in additional interest*— nearly **ten times** the *interest* amount Chesapeake had already paid and nearly **two times** the *principal* amount of the Deficiency. This directly contradicted the agreement between the Parties, which only required Chesapeake to pay interest on the Deficiency ($7,466,599). Unfortunately, to avoid growing liabilities as a result of the IRS's unfounded position, Chesapeake was forced to pay the erroneous interest before it could then, and ultimately did, seek a refund of $12,644,769 in improperly assessed interest. Chesapeake brought this action to obtain its refund, which refund is required by the Parties' binding agreement.

---

[1] "IRS" refers to the Internal Revenue Service of the United States of America, and "Chesapeake" refers to Plaintiff Chesapeake Energy Corporation.

Although this case ultimately hinges on straightforward contract interpretation, an appreciation of the underlying tax issues provides necessary context. The settlement documents resolve the Parties' dispute as to two highly complicated and esoteric tax issues relating to the former corporate alternative minimum tax. These underlying tax issues, as described further below, compel that the only possible interpretation—the one explicitly agreed to by the Parties—is the one advanced by Chesapeake.

To be clear, Chesapeake does not dispute that it was required to *pay* interest, but it squarely disputes *how* that interest should be computed. Chesapeake's position is straightforward: the Parties agreed to a series of documents to reflect their settlement of complex tax issues (the "Settlement"). Based on a plain reading of the settlement documents, the Settlement only required Chesapeake to pay interest "on the deficiency" of $7,466,599, until paid in full, which Chesapeake indisputably did. Chesapeake is, therefore, entitled to summary judgment and a refund in the amount of $12,644,769 from the IRS, plus interest from the date of payment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The examination function ("Exam") of the IRS conducted an audit of Chesapeake's U.S. consolidated group federal income tax returns for each of tax years 2010–2013. Doc. 10, Answer at 2, ¶ 6 (admitted).

2. For 2010–2013, Chesapeake claimed various net hedging losses and gains from hedging transactions used to hedge the sales of oil and gas, which it included in gross income under 26 U.S.C. § 57(a)(2)(C), as in effect in 2010–2013 on Chesapeake's originally filed tax returns for 2010–2013. *Id.* at 2, ¶¶ 7–10 (admitted).

3.      Exam agreed that Chesapeake incurred these amounts as net hedging gains or losses in tax years 2010–2013, respectively, from hedging transactions used to hedge the sales of oil and gas, but Exam disagreed that these were appropriately included in Chesapeake's gross income under 26 U.S.C. § 57(a)(2)(C) in 2010–2013 ("the Hedging Issue"). *Id.* at 2, ¶ 11 (admitted).

4.      In the years at issue, corporations, including Chesapeake, were required to compute their tax liability for both regular tax purposes and for alternative minimum tax ("AMT") purposes. *Id.* at 2, ¶ 12 (admitted).

5.      Resolution of the hedging issue impacted how Chesapeake would compute its AMT liability for each of tax years 2010–2013. *Id.* at 2, ¶ 13 (admitted).

6.      Chesapeake made an election on its tax return for 2009 under 26 U.S.C. § 172(b)(1)(H) with respect to AMT net operating losses ("ATNOLs") arising in 2009 ("Stimulus ATNOLs") to treat such ATNOLs as subject to a special ATNOL ordering rule set forth in Section 172(b)(1)(H) (the "Stimulus Provision Ordering Rule"). *Id.* at 2, ¶ 14 (admitted).

7.      Section 172(b)(1)(H) of the Code was amended as a result of the Worker, Homeownership, and Business Assistance Act of 2009 (the "Stimulus Provision"), which was enacted as part of a stimulus package to respond to the recession of 2008 and 2009. *Id.* at 2, ¶ 15 (admitted).

8.      As a result of Chesapeake's election, in completing its original tax returns for each of tax years 2010–2012, Chesapeake absorbed its Stimulus ATNOLs only after all

other ATNOLs for other years had been fully absorbed to the full extent permitted under Section 56(d)(1)(A)(i). *Id.* at 2, ¶ 16 (admitted).

9.      Exam disagreed that Chesapeake could absorb its Stimulus ATNOLs only after all other ATNOLs for other years had been fully absorbed to the full extent under Section 56(d)(1)(A)(i) (the "ATNOL Issue"). *Id.* at 2, ¶ 17 (admitted).

10.    Chesapeake filed a protest to appeal Exam's conclusion on the Hedging Issue and ATNOL Issue with the IRS Independent Office of Appeals ("Appeals"). *Id.* at 2, ¶ 19 (admitted).

11.    After both a traditional conference with Appeals and a mediation with Appeals (a "post-Appeals mediation" or a "PAM"), Chesapeake and Appeals reached a compromise on both the Hedging Issue and the ATNOL Issue. *Id.* at 2, ¶ 20 (admitted).

12.    Chesapeake and Appeals agreed at the PAM to settle the ATNOL Issue 75%-25% in Chesapeake's favor and to settle the Hedging Issue 85%-15% in favor of the IRS. *See* **Ex. 1**, Closing Agreement at 1, ¶ 2(b)(ii); *see also* **Ex. 3**, Shaw Declaration at 1–2, ¶¶ 5–6.

13.    Thereafter, the IRS and Chesapeake jointly executed an IRS Closing Agreement (the "Closing Agreement," **Ex. 1**) and an IRS Form 870-AD ("Form 870-AD," **Ex. 2**) (collectively, the "Settlement Documents"). Doc. 10, Answer at 3, ¶ 30 (admitted).

14.    Under the agreement, Appeals and Chesapeake agreed that Chesapeake had no tax deficiency (or refund) for 2010, 2011, or 2013, but that Chesapeake had a single tax deficiency of $7,466,599 for 2012. *Id.* at 3, ¶ 31 (admitted).

15.     The Parties further agreed that Chesapeake would only owe interest on the singular Deficiency. *See* **Exs. 1–2**, Settlement Documents.

16.     The IRS also issued a Form 3610 audit report ("Form 3610") which recognizes the single Deficiency ($7,466,599) and further states that "[r]estricted interest applies for 2012 and will continue to accrue on the deficiency until it is paid in full." **Ex. 4**, Form 3610 at 1.

17.     Chesapeake and Appeals also agreed that Chesapeake would forego the right to use any Stimulus ATNOLs after its 2014 tax years and that it would only be able to utilize such Stimulus ATNOLS as regular ATNOLs. *See* **Ex. 1**, Closing Agreement at 2, ¶ 3; **Ex. 3**, Shaw Declaration at 2, ¶ 10.

18.     The Closing Agreement described an agreed-upon manner for computing the amounts of Chesapeake's ATNOL deductions for tax years 2010, 2011, and 2012. Doc. 10, Answer at 3, ¶ 34 (admitted).

19.     Following execution of the Settlement Documents, on April 17, 2018, Chesapeake paid $8,854,573 to the IRS, of which $7,466,599 was applied to the Deficiency and $1,387,974 to interest. *Id.* at 3, ¶ 35 (admitted).

20.     Thereafter, Chesapeake was assessed additional interest by the IRS in the amount of $11,963,864.62 and $680,904.05, which it paid in total ($12,644,768.67). *See* **Ex. 3**, Shaw Declaration at 2, ¶ 8; Doc. 10, Answer at 4, ¶¶ 47, 49 (admitted as to payments of additional interest).

21.     In 2019, Chesapeake sought a refund in the amount of $12,644,768.67 for the additionally assessed interest by the IRS. Doc. 10, Answer at 4, ¶ 52 (IRS "admits Chesapeake seeks a refund of $12,644,769").

22.     Chesapeake filed for a refund of this amount and more than six months have elapsed since then and no action has been taken by the IRS regarding the refund. **Ex. 3**, Shaw Declaration at 2, ¶ 9.

## LEGAL STANDARD

To warrant summary judgment, a movant must show "there is no genuine issue as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The interpretation of an unambiguous contract is a question of law to be determined by the court, and may be decided on summary judgment." *Pub. Serv. Co. of Okla. v. Burlington N. R. Co.*, 53 F.3d 1090, 1096 (10th Cir. 1995) (citations omitted). The issue presented here is ripe for summary judgment—whether the IRS improperly computed the interest it assessed against Chesapeake based upon the unambiguous Settlement Documents. Further, the Parties agree "that this case involves purely legal questions for the Court." Doc. 23 at 2, ¶ 3.

## ARGUMENT AND AUTHORITY

Chesapeake's argument can be summarized as follows:

- After lengthy negotiations, the Parties agreed on the resolution of two complex tax issues in the Settlement.

- The Parties' disagreement on these complex tax issues went both to the *substance* and the *computational effect* of the tax issues. The Settlement Documents addressed both.

- The Settlement is documented in the Settlement Documents.

- The Settlement Documents unambiguously set forth a single tax liability—the Deficiency ($7,466,599).

- The Settlement Documents clearly state that the Deficiency is the only amount upon which interest was to be assessed. The Settlement Documents do not include any other amounts on which interest could possibly be assessed.

- The Settlement Documents should be interpreted according to their unambiguous terms.

- Therefore, the IRS could only assess interest on the Deficiency set forth in the Settlement Documents.

- The IRS, however, improperly assessed an additional $12,644,769 in interest, which Chesapeake paid and for which Chesapeake is entitled to a refund.

*See* UMF Nos. 1–22.

## 1.    Two Tax Issues in Dispute in the IRS Audit

For the 2010–13 tax years, the Settlement Documents resolved two disputed tax issues. UMF No. 1–13. Both issues related to the AMT liability for these tax years. *Id.* The first issue related to how hedging gains and losses should be treated for AMT purposes (*i.e.,* the Hedging Issue). UMF No. 3. The second issue related to a special rule that applied to a particular year's net operating losses generated under the AMT (*i.e.,* ATNOLs and the ATNOL Issue). UMF No. 9. The two issues were interrelated, as both were material components in the calculation of Chesapeake's potential AMT liability. UMF No. 5. A slight change in the amount Chesapeake might concede on either issue would have materially impacted Chesapeake's AMT cash tax liability. *Id.* Naturally, Chesapeake's main concern was the amount of money it would have to pay, not whether or how much it would be

willing to concede on a particular issue. The negotiation landed upon simultaneously set-tling both issues and agreeing to a dollar amount that Chesapeake was willing to pay—not a specific dollar amount *and twice that amount in interest*.

Due to the complexity of these two issues and the Parties' desire for finality, the Parties had to find an "outside the box" solution to resolve the issues so that Chesapeake's tax liability could be determined in a single amount. As discussed below, without this so-lution, recomputations of Chesapeake's tax liability would have been needed for years into the future due to the complex mechanics of the tax law surrounding the ATNOL Issue.

Because of the interplay between the Hedging Issue and the ATNOL Issue, the Par-ties agreed to first determine the output from the Hedging Issue and then determine Ches-apeake's tax liability from settlement of the ATNOL Issue. This innovative approach ne-gotiated by the Parties is set forth in the Settlement Documents. UMF No. 13.

## 2.    Legal Authority Supporting Chesapeake's Position

Simply stated, the interest dispute here boils down to whether Chesapeake owes interest on the Deficiency amount set forth in the Settlement Documents *or* whether it owes interest computed by a hypothetical, fictional tax deficiency amount never agreed to by the Parties and found nowhere in the Settlement Documents. The former is the only permissi-ble method by which interest could be—and was agreed to be—computed.

An understanding of the unique tax rules in play—and how the Parties settled those issues—demonstrates why Chesapeake's stance is the only supportable outcome. Gaining

that understanding, however, takes some legwork because the relevant tax code provision, the Stimulus Provision,[2] is admittedly complex.

### a. Normal Tax Rules Before Considering the Stimulus Provision

During the tax periods at issue here, there were two tax structures applicable to corporations: 1) the regular corporate income tax and 2) the AMT.[3] Corporate taxpayers were required to calculate both the regular and AMT tax and were then required to pay the higher amount resulting from either. This case concerns the AMT, which is calculated in a similar manner as the regular corporate income tax and utilizes many of the same inputs. Although the AMT tax rate is lower than the regular corporate income tax rate, the AMT allows fewer deductions. And while some of the same deductions are allowed under the AMT, they are allowed in lesser amounts, generally resulting in higher amounts of taxable income. In calculating AMT, the amount resulting from revenue minus deductions is alternative minimum taxable income ("AMTI"). This AMTI (if positive) is multiplied by the AMT tax rate and the resulting number is a taxpayer's AMT tax liability. *See* **Ex. 5**, AMT Basic Operation Example. When a corporation has negative AMTI, the corporation generates an AMT net operating loss (*i.e.,* an ATNOL). For the tax years at issue here, ATNOLs

---

[2]  *See* Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. No. 111-92, 123 Stat. 2984 (November 6, 2009).

[3]  The AMT (26 U.S.C. § 56(c)) was repealed effective for tax years beginning after January 1, 2018. 2017 Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 12001(b)(8)(A). Sections of the Internal Revenue Code (26 U.S.C.) cited refer to the version in effect during the years at issue unless otherwise indicated.

could be carried forward and backward to other tax years to offset otherwise positive AMTI.[4]

A corporation is required to file an annual tax return reflecting its revenues and deductions to determine whether it has taxable income or a loss. 26 U.S.C. § 6012(a)(2). Consistent with this annual tax year concept, a taxpayer can compute its tax liability for such year by the end of that tax year. *See* 26 U.S.C. §§ 61, 161–162. By the end of each tax year, a taxpayer will know the amount of its revenues and deductions recognized for such year, and, at the beginning of that tax year, the taxpayer will know the amount of certain tax attributes that a taxpayer is allowed to carryforward from a prior year to use in the current tax year. *See* 26 U.S.C. §§ 56(d), 61, 161–162, and 172. One such attribute that may be carried forward are unutilized net operating losses from prior years, both regular net-operating losses ("NOLs") and ATNOLs. *See* 26 U.S.C. §§ 56(d), 172. Thus, when a taxpayer files its original tax return for a given tax year, a taxpayer reports the income and loss recognized for that year and the amount of tax attributes from a prior year that the taxpayer can use in such year.[5]

The general rules for the mechanics of how NOLs and ATNOLs are utilized begin in 26 U.S.C. § 172(a). Section 172(a) provided, in the years at issue, that a deduction was allowed to the extent of available NOL carryforwards or carrybacks.[6] Section 172(b)(1)

---

[4]  *See generally* former 26 U.S.C. § 56(c).

[5]  *See* IRS Form 1040 and IRS Form 1040 Instructions, available at https://www.irs.gov/forms-pubs/about-form-1040 (last visited Apr. 6, 2022).

[6]  26 U.S.C. § 172 has been modified for subsequent tax years but the law outlined here represents the law in effect during the relevant tax years.

provided a number of rules detailing the years to which an NOL may be carried, however the only ones that are relevant to the current issue are that NOLs could be carried forward up to 20 years and carried back up to 2 years. Section 172(b)(2) provided that "[t]he entire amount of the net operating loss for any taxable year . . . shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried."  Section 172(b)(2) further stated that any remaining NOL must be carried to the next taxable year. Finally, Section 172(b)(3) allowed taxpayers to make an election to not carry an NOL back to a prior year, however taxpayers couldn't elect *not* to utilize available NOL carryforwards. When an NOL is carried to a tax year and is not otherwise limited, the mechanics of the statutes do not allow for any result other than the reduction of taxable income (regular or AMT). *See* 26 U.S.C. § 172(b).

### b.  The Stimulus Provision Ordering Rule

As part of the Stimulus Provision, which was enacted to restart capital investment and recover jobs lost in the recession following the 2008 financial crisis, Congress created a temporary and special class of NOLs (*i.e.,* the Stimulus ATNOLs) that were not subject to the traditional restrictions on utilization that applied to ordinary ATNOLs. *See* 26 U.S.C. § 56(d)(1)(A). The Stimulus ATNOLs were enacted to blunt the impact of the "Great Recession" and could be utilized by a taxpayer to a greater extent and sooner than was the case without this legislation. *Id.* To effect the desired stimulus, Congress created a new ordering rule for the Stimulus ATNOLs. Taxpayers were permitted to elect this special treatment for ATNOLs generated in either 2008 or 2009, and Chesapeake elected this classification for its 2009 ATNOLs. UMF No. 6. Under this new law, Stimulus ATNOLs could

11

offset up to 100% of a taxpayer's AMTI in any carryover year, whereas ATNOLs could ordinarily only offset up to 90% of such AMTI in any given year. *See* 26 U.S.C. § 56(d)(1)(A).

The new Stimulus Provision Ordering Rules also changed the way ATNOLs were absorbed (*i.e.*, the order in which the ATNOLs would be treated as utilized). The normal NOL absorption rules follow the easy to understand first-in, first-out principle ("FIFO"). *See* 26 U.S.C. § 172(b)(2). As to the Stimulus ATNOLs, Congress chose to employ a different ordering rule that upended the longstanding ordering rules discussed above. *Id.* The Stimulus Provision Ordering Rule is accomplished under the statute by creating two ATNOL "buckets," one with the non-Stimulus ATNOLs and the other with the Stimulus ATNOLs. 26 U.S.C. § 56(d)(1)(A). First, non-Stimulus ATNOLs are absorbed in the non-Stimulus ATNOL bucket (includes non-Stimulus ATNOLs created in tax years before and after the tax year in which the Stimulus ATNOLs were created). *Id.* Second, the deduction for any Stimulus ATNOLs is computed to offset up to 100% of any remaining taxpayer AMTI "reduced by the amount determined" in that first bucket. *Id.* Specifically, under Section 56(d)(1)(A), the amount of the ATNOL deduction "shall not exceed the sum of"

> (i) the lesser of--
>> (I) the amount of such deduction attributable to net operating losses (**other than the deduction described in clause (ii)(I)**) [*i.e.*, other than the deduction for WHBAA ATNOLs], or
>>
>> (II) 90% of AMTI determined without regard to such deduction and the deduction under § 199, **plus**
>
> (ii) the lesser of--
>> (I) the amount of such deduction attributable to [WHBAA ATNOLs], or

(II) **AMTI** determined without regard to such deduction and the deduction under § 199 **reduced by the amount determined under clause (i)**.

*Id.* (emphasis added). Because the Stimulus Provision Ordering Rule differs from the standard FIFO method, the tax code provides that "appropriate adjustments" must be made to the existing ordering rules (Section 172(b)(2)) to account for the changes. 26 U.S.C. § 56(d)(1)(B)(ii). Aside from modifications to Section 172 rules, like the one above, the general mechanics provided for in Section 172 for the utilization of NOLs remained applicable. *Id.* at (d)(1); *see also* **Ex. 6**, Stimulus ATNOL Example at Example #1 (example of the mechanics of the two buckets). Part of Example #1 is reflected below showing the 2010 AMTI being first offset by Bucket #1 non-Stimulus ATNOLs (those generated in 2008 and 2011) and then Bucket #2 Stimulus ATNOLs (those generated in 2009).

| | | | |
|---|---|---|---|
| | 2010 AMTI | 4,000 | |
| (c) | non-Stimulus ATNOL - 2008 | (1,000) | Bucket #1 - non-Stimulus ATNOL Bucket |
| | non-Stimulus ATNOL - 2011[3] | (2,600) | |
| | 2010 AMTI Before 2009 Stimulus ATNOL | 400 | |
| (d) | 2009 Stimulus ATNOL Carryforward[4] | (400) | Bucket #2 - Stimulus ATNOL Bucket |
| | 2010 AMTI After 2009 Stimulus ATNOL Carryforward[5] | - | |

The Stimulus Provision Ordering Rules further complicate the ATNOL absorption calculations when new non-Stimulus ATNOLs are created in subsequent tax years and carried back into tax years where the Stimulus ATNOLs were originally absorbed. When non-Stimulus ATNOLs are created in subsequent tax years and carried back, the newly created non-Stimulus ATNOL carrybacks are added to the already existing non-Stimulus ATNOLs, which necessitates a redetermination of which ATNOLs are absorbed in the prior year(s). *See* 26 U.S.C. § 56(d)(1)(A)(ii). Stimulus ATNOLs that were previously absorbed are "recycled" and replaced with newly available non-Stimulus ATNOLs on a one-

for-one basis. The end result is a change in which types of ATNOLs (Stimulus or non-Stimulus ATNOLs) that were absorbed in a given year and the types of ATNOL carryforwards that will be available to carryforward into future tax years. An example of this can be seen in Note (6) of Example #1 on **Ex. 6**. Part (B) of Example #1, shows 2010 AMTI being offset first by Bucket #1 non-Stimulus ATNOLs from 2008 and then from Bucket #2 Stimulus ATNOLs from 2009. Part (C) then demonstrates the recalculation required when non-Stimulus ATNOLs are generated in 2011, replacing $1,100 of the 2009 Stimulus ATNOLs that were previously utilized with 2011 Bucket #1 non-Stimulus ATNOLs.

These complex tax changes led to the ATNOL Issue, which was ultimately resolved in the Settlement and Settlement Documents.

### c. Interest Under 26 U.S.C. § 6601

26 U.S.C. § 6601(a) sets forth the general rule regarding interest owed on underpayments, specifically charging interest on the "amount of tax imposed" under the tax code with respect to any given taxable period. Under Section 6601(d), where a future NOL is carried back and reduces taxable income in a prior year, this reduction does not affect the computation of interest under Section 6601(a) for the period prior to the generation of the NOL carryback in a later tax year (*i.e.*, the filing date of the tax return creating the carryback). However, Section 6601(d) cannot be applied as contemplated by the IRS here to situations involving the Stimulus Provision Ordering Rule. Section 6601(d) simply does not contemplate, and by its terms does not apply to, a scenario where Stimulus ATNOLs are initially treated as utilized and then later "recycled" for use in a later tax year.

14

### 3.   The Parties' Settlement of the ATNOL Issue

Due to these complexities of the Stimulus Provision Ordering Rule, the Parties never reached any settlement or compromise regarding their competing and incompatible views of 26 U.S.C. § 56(d)(1)(A) and the Stimulus Provision Ordering Rule. Instead, as reflected in the Closing Agreement, the Parties agreed to settle their ordering dispute—75%/25% in Chesapeake's favor. UMF No. 12. Because of the fundamental disagreement between the Parties as to how the Stimulus Provision Ordering Rule worked, it was difficult to determine how to apply the 75% concession by the IRS to compute the net amount owed. So, the Parties developed the "outside of the box" solution, agreeing to a construct of computing a single number for an ultimate deficiency (*i.e.*, the Deficiency, $7,466,599) for the 2012 tax year *without agreeing to the underlying changes to the 2012 deficiency year or the subsequent years that resulted in a carryback to 2012*. UMF Nos. 12–14.

The agreed-upon methodology used to determine the plug amount—the Deficiency—started with a determination of the amount of the ATNOLs (both Stimulus and non-Stimulus) that would be available. This amount was then subtracted from the agreed upon AMTI resulting from the settlement of the Hedging Issue. Under the terms of the Closing Agreement (**Ex. 1**), the amount of ATNOLs for a given year was calculated by taking 75% of the amount calculated under Chesapeake's methodology ("Chesapeake's Methodology") and 25% of the amount calculated under the IRS's methodology ("IRS's

Methodology").[7] UMF No. 12. The rules for both methodologies are set forth in Exhibits 1–2 to the Closing Agreement (**Ex. 1**). UMF No. 13. The amount resulting from this calculation construct is the Deficiency reflected on the Form 870-AD (**Ex. 2**). *Id.*

Under Chesapeake's interpretation of the Stimulus Provision Ordering Rule, it was not possible to know how much of an ATNOL carryforward may be utilized in a given tax year until the end of the second following tax year (*e.g.,* for 2012 Chesapeake didn't know the amount of ATNOL carryforwards from previous tax years that it could utilize in 2012 until December 31, 2014). In contrast, under the normal rules involving non-Stimulus ATNOLs, Chesapeake would have known such amount on January 1, 2012 (*i.e.*, there was no potential for the recycling of Stimulus ATNOLs). Chesapeake's Methodology requires multiple iterations, each of which involve the utilization of all available ATNOLs (both Stimulus and non-Stimulus ATNOLs), to the extent necessary to fully offset its AMT liability. Under Chesapeake's Methodology, recalculations would have been necessary any time non-Stimulus ATNOLs were generated in future tax years and could be carried back to replace Stimulus ATNOLs that were previously absorbed. As the Stimulus ATNOLs were replaced, the recycled Stimulus ATNOLs could be carried forward into future tax years. In addition, recycling of Stimulus ATNOLs could have changed the amount of

---

[7] An example of the calculation of the 75%/25% split can be seen using numbers on Schedule A (discussed below). The amount of the 2009 Stimulus ATNOL utilized in the 2012 tax year would be calculated by taking 25% of amount of 2009 Stimulus ATNOL the IRS Methodology shows as utilized ($55,820,315 (H)) and 75% of the amount Chesapeake's Methodology shows as utilized ($170,994,669 (I)). This results in $142,201,801 (C) of 2009 Stimulus ATNOL that was utilized in determining the amount of the plug number that is the Deficiency.

AMTI after ATNOLs because of the newly, re-available Stimulus ATNOLs' ability to off-set 100% of AMTI (versus non-Stimulus ATNOLs being limited to 90% of AMTI).[8]

In contrast to Chesapeake's Methodology, the IRS understood the Stimulus Provision Ordering Rule differently and argued that it *was* possible to determine the amount of carryforwards from prior tax years that could be used in a given tax year. The IRS's Methodology, in Chesapeake's opinion during the resolution of the ATNOL Issue with Appeals, ignores the statutory text and placed all the ATNOLs (both Stimulus and non-Stimulus) into a single bucket and requiring the absorption of ATNOLs to be done in a FIFO manner.[9]

This (perhaps painstaking) summary of the competing methodologies explains why the calculation construct was necessary and why the only way to settle the dispute was through calculation of a plug (*i.e.*, the Deficiency). Combining the two methodologies into one calculation would have been impossible because simultaneously applying the two methodologies in a single calculation would have required applying different rules to both different percentages and different amounts of Stimulus and non-Stimulus ATNOLs. These different percentages and rules would have needed to be reapplied each time a recalculation was required under Chesapeake's Methodology. Desiring finality, however, the Parties agreed that it was necessary to determine only a single amount that was acceptable to both

---

[8]  *See* **Ex. 6**, Stimulus ATNOL Example at Example #1, Note (3) (detailing that the non-Stimulus ATNOLs in Bucket #1 are limited in total to $3,600 or 90% of the $4,000 of 2010 AMTI they are offsetting).

[9]  *See* **Ex. 6**, Stimulus ATNOL Example at Example #3 (showing how AMTI can exist under the IRS's improper use of FIFO where it wouldn't otherwise exist under Chesapeake's Methodology). By using the non-Stimulus ATNOLs first, the end result is that Chesapeake's methodology reduces the total AMTI after ATNOL to $0 where the IRS's Methodology leaves $200 of AMTI after ATNOL that would result in a tax liability).

Parties—the Deficiency ($7,466,599)—and to not have this issue lingering into future tax years. UMF No. 14. This intended single deficiency result is reflected in the plain language of the Settlement Documents as the Deficiency. UMF Nos. 13–14.

To Chesapeake's knowledge, Chesapeake's case is the first in which the Stimulus Provision Ordering Rule has been an issue in dispute and the only case in which any settlement (in this case 75%/25% in Chesapeake's favor) was reached. Consequently, the interest question that arises in this case is not only a case of first impression, but is likely the only such case that will ever arise, given that no other taxpayers appear to have been challenged on how this unique (one-time) Stimulus Provision Ordering Rule applies, let alone reached a settlement on this issue.

**4.    The Plain Language of the Settlement Documents Sets Forth that the Parties Agreed Only to a Single Deficiency and Interest Thereon**

The Settlement Documents (**Exs. 1–2**) signed by the Parties, formalized the Settlement and include a closing agreement under 26 U.S.C. § 7121. UMF No. 13. The Settlement Documents are interpreted under federal common law. *See U.S. v. ConocoPhillips Co.*, 744 F.3d 1199, 1204 (10th Cir. 2014) (citing *U.S. v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir. 1996)). Therefore, the issue in this case is one of legal contract interpretation—what did the Parties agree as to the interest owed by Chesapeake under the Settlement? As explained in detail below, as a matter of law, under the plain language of the Settlement Documents, the Settlement Documents can only be interpreted as charging interest on the Deficiency itself, and not with respect to other amounts not set forth in the Settlement Documents and not agreed to by the Parties.

18

The Closing Agreement sets forth three issues that are resolved by the Closing Agreement: 1) the amounts taken into account for each of the years 2010–2013 for the Hedging Issue (Issue 1); 2) the computational methodology for reaching an agreement on the ATNOL Issue (Issue 2); and 3) an additional concession by Chesapeake that was demanded by the IRS related to the ATNOL Issue (Issue 3). **Ex. 1**, Closing Agreement at 1–2. In contrast to the Closing Agreement's plain language under Issue 1, which provided for annual amounts that the Parties agreed would be taken into gross income, Issue 2 solely agrees to a *computational methodology* for resolving the ATNOL Issue and the plug amount that resulted from the computational methodology (the Deficiency, $7,466,599). It does not set forth a basis to changes in income or loss for any tax year to produce the Deficiency at issue. Rather, it simply computes a plug Deficiency amount which is divorced from the underlying income and loss reported by Chesapeake.

Chesapeake does not dispute that the Form 870-AD further provides that Chesapeake owed—*on the Deficiency*—"interest as provided by law." **Ex. 2**, Form 870-AD at 1. Chesapeake does not dispute that it owed interest on the amount it agreed to (the Deficiency) nor is Chesapeake disputing that it owes the interest that is provided by law. Rather, Chesapeake is seeking a refund so that the only interest that it owed on the Deficiency is the interest provided by law as applied to specific language of the Settlement Documents. Chesapeake's dispute is solely with respect to the interest that the IRS assessed upon amounts other than the Deficiency that were never agreed to by Chesapeake, are not correct as a matter of law, and are inconsistent with the scope, purpose and text of the Settlement Documents. UMF No. 13–15.

The Settlement Documents set forth the final terms of the Settlement. The Settlement Documents contain only the single deficiency amount of $7,466,599 for the 2012 taxable year—the Deficiency—and no deficiency amounts for 2010, 2011, or 2013. UMF No. 14. This clear language shows that the Parties agreed solely upon the Deficiency, resolved in the manner as set forth under the Closing Agreement. Because the agreement in the Settlement Documents with respect to this issue was only that the Parties would use the computational methodology to calculate the plug amount (the Deficiency), no agreement was reached on the other terms that would result in the IRS's punitive tax assessment. Accordingly, interest can't be assessed on amounts not agreed to in the Settlement Documents.

In addition to the Form 870-AD, the Form 3610 further confirms that the Parties agreed to only a single settlement amount (the Deficiency) and that interest would apply to only the Deficiency. UMF No. 16. The Form 3610 plainly states that "[r]estricted interest applies for 2012 and will continue to accrue **on the deficiency** until it is paid in full." **Ex. 4,** Form 3610 at 1 (emphasis added). The Settlement Documents and the Form 3610 refer to the word deficiency in a number of places relating to 2012, all of which list $7,466,599 as the deficiency. Neither the Settlement Documents nor the Form 3610 sets forth any other amounts as a deficiency for 2012, nor for any other tax years.

**5.   The IRS's Interest Calculations Are Not Permissible Under Statute or the Terms of the Settlement Documents**

Instead of calculating interest solely on the Deficiency as agreed, the IRS appears to have improperly calculated interest by applying the general rules of 26 U.S.C. § 6601(d)

to numbers from schedules included in the Form 3610 (the "Improper Interest Calculation Construct"). The Form 3610 contains a number of schedules, however the ones of importance to this analysis are the ones labeled Schedules A–C (collectively the "*Schedules*"). *See* **Ex. 4**, Form 3610 at Schedules A–C. Even if Chesapeake were completely mistaken, and the Parties did not agree to settle the dispute by agreeing upon a single deficiency amount (they did), the IRS's Improper Interest Calculation Construct would still not be a permissible method to compute interest. Interest must be computed either by the terms of the Settlement Documents based on a single deficiency amount or, at the very least, in a manner in compliance with the tax code. Instead, the IRS followed neither course.

The analysis below provides further support for why the IRS's Improper Interest Calculation Construct can't be reconciled with the Settlement Documents, further substantiating the fact that the Settlement was intended to apply interest only on the Deficiency.

### a. The Parties Agreed to Use Restricted Interest Because Using the General Interest Rules Was Not Possible Given the Nature of the Settlement

The Parties expressly agreed to calculate interest based on the restricted interest rules because a calculation of interest utilizing the general rules under 26 U.S.C. § 6601 was not possible given both the Stimulus Ordering Rule and the nature of the Settlement (*i.e.*, when Stimulus ATNOLs are utilized but later recycled and replaced by non-Stimulus ATNOLs and/or when the settlement reached is only on a single deficiency amount).

Restricted interest is a term used when less interest is owed than would otherwise be owed:

(2)   Interest may be limited to specific time periods or rates, or it may be statutorily

21

prohibited. This gives rise to the term "restricted interest." There are two reasons why interest is restricted:

    a.  Conditions may exist that prevent the computer from generating an accurate amount; and

    b.  Special provisions in law limit or prohibit interest.

Internal Revenue Manual Section 8.17.6.1.[10] Restricted interest is not *defined* in either the Internal Revenue Code or the regulations thereunder, but it may arise under various provisions of the Internal Revenue Code. *See, e.g.*, Rev. Proc. 60-17, 1960-2 C.B. 942 (providing for a list of special provisions in law where interest is restricted).[11]

Generally, in the IRS view, restricted interest may apply under Section 6601(d) in the case of normal carrybacks or carryovers.[12] However, no court has interpreted the concept of restricted interest with respect to the Stimulus Provision Ordering Rule. And here, as described above, given the nature of the Stimulus Provision Ordering Rule, Section 6601(d) cannot by its terms apply—Section 56(d)(1)(A) precludes that. Thus, "restricted interest" cannot merely mean the rote application of Section 6601(d) in this context.

The *IRS's* Form 3610 states that "**restricted interest applies for 2012** and will continue to accrue **on the deficiency** . . . " **Ex. 4**, Form 3610 at 1 (emphasis added). This

---

[10] Available at https://www.irs.gov/irm/part8/irm_08-017-006 (last visited Apr. 6, 2022).

[11] Revenue Procedures, as procedural rules promulgated by the IRS without need of approval from the Secretary of the Treasury, are generally not considered rules which are binding on a court. *See, e.g.*, *Browning v. Comm'r*, 55 T.C.M. (CCH) 1232 (1988) ("Revenue Rulings and Revenue Procedures are not binding on this Court."); *Estate of Shapiro v. Comm'r*, 111 F.3d 1010 (2d Cir. 1997) (discussing how revenue procedures are directory guidelines without the force of law).

[12] *See* Internal Revenue Manual Section 4.75.13.8.13, available at https://www.irs.gov/irm/part4/irm_04-075-013 (last visited Apr. 6, 2022).

statement cannot be read to extend restricted interest to apply to anything other than "on the deficiency" (i.e., $7,466,599). Moreover, as outlined above, construing it otherwise violates the Stimulus Provision Ordering Rule's application to Section 6601(d). Contract terms must be construed to be reasonable and lawful:

> an interpretation which gives a **reasonable, lawful, and effective meaning** to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]

Restatement (Second) of Contracts § 203 (emphasis added).[13]

In cases involving NOL carrybacks, IRS undoubtedly regularly applies the rote application of Section 6601(d), not for one off incidences like this Settlement that require the application of complex rules, which is why the Parties agreed on a single Deficiency. The Parties expressly agreed that the restricted interest rules would be applicable to the Deficiency because the Parties knew that this case was outside the norm.

The IRS, however, is treating this as a plain vanilla case in which a deficiency is found to exist after application of a subsequent year carryback. That is not the fact pattern of this case. The standard IRS protocols for computing interest in a carryback situation cannot apply in this case because the predicates for such application simply do not exist in this case.

---

[13] *See Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 n.6 (D.C. Cir. 2001) (federal courts "look to the . . . Restatement when deciding questions of federal common law.").

**b. The Obvious Conflict Between the IRS's Improper Interest Calculation Construct and Parties' Methodologies Serves as Further Evidence that the IRS's Interest Calculation is Improper**

The unreconcilable conflict between the IRS's Improper Interest Calculation Construct and the methodology set forth by either Party further supports the fact that the IRS's interest calculations are plainly incorrect.

As discussed above, the Parties did not agree as to how the Stimulus Provision Ordering Rule should apply. Instead, they agreed on parameters for determining the amount of ATNOLs used in determining the Deficiency and then agreed that interest would apply to only the Deficiency. However, the IRS's Improper Interest Calculation Construct calculates interest as if: a) the numbers reflected in the Schedules represent the proper basis for calculating interest; and b) the general rules of 26 U.S.C. § 6601(d) apply to the numbers reflected in the Schedules. This is not consistent with the Agreement reached by the Parties.

Because the agreed upon methods for calculating the ATNOL amounts (the rules listed in Exhibits 1–2 to the Closing Agreement (**Ex. 1**)) were for the limited purpose of calculating the Deficiency, applying interest to only the Deficiency is a simple formula (Interest = Deficiency x Interest Rate x Time Period). This is the way Chesapeake calculated and paid interest on the Deficiency, as required by the Settlement Documents. UMF No. 19. However, under the IRS's Improper Interest Calculation Construct, the IRS is: 1) calculating interest with one amount of AMTI for a period, 2) then carrying back a 2013 non-Stimulus ATNOL, and 3) then calculating interest on another amount of AMTI (this time the Deficiency) for the remainder of the period. As such, the timing of when and how ATNOLs are utilized impacts the IRS's interest calculation. However, the IRS calculation

disregards the rules agreed to by the Parties for determining the ATNOL absorption that was used in determining the Deficiency.

Although the Parties' methodologies differ in many ways, the parameters in both methodologies explicitly require the application of 26 U.S.C. § 172(b)(1–2).[14] The application of these sections necessitates that all ATNOLs (Stimulus and non-Stimulus) are carried to the earliest year in which the ATNOLs can be utilized. Thus, neither methodology allows for a result that leaves any ATNOLs available, yet unabsorbed. However, this is exactly what the IRS's interest calculation attempts to do by utilizing the point in time ATNOL amounts listed on Schedule A. This is the same improper calculation reflected in Example #2A of **Ex. 7**, ATNOL Absorption Mechanics Example **(**discussed above where the taxpayer improperly carried forward only $50 of ATNOL when it was required under the tax code to carry forward $90 of ATNOL).

Schedule A (**Ex. 4** at Schedule A) is a summary schedule which lists the relevant AMTI and ATNOLs that would typically be necessary to calculate interest (although not so in this case due to the complexity added by the Stimulus Provision Ordering Rule). Schedule A contains three tables which reflect the calculation of AMTI after the deduction of ATNOLs. All three start with the same AMTI before the deduction of ATNOLs (AMTI determined based on settlement of the Hedging Issue). The first two (labeled IRS position and TP position) reflect the result of how each Party believed the Stimulus Provision Ordering Rule works (the ATNOL Dispute) and the third, labeled Per Mediation, represents

---

[14] *See* **Ex. 1,** Closing Agreement at Exhibits 1–2.

the Settlement reached by the Parties. As shown on the TP position and Per Mediation tables of Schedule A, Stimulus ATNOLs remained to be carried forward into the 2014 tax year in both tables. On the TP position table, $150,994,531 of Stimulus ATNOL (F) remained and on the Per mediation table, $105,261,142 of Stimulus ATNOL (G) remained. As discussed below, calculating interest with these amounts unaccounted for is simply not permitted under Chesapeake's Methodology, the IRS's Methodology, or the tax code.

Chesapeake's Methodology does not allow for any ATNOLs to be available and unutilized. Rules 1 and 2 of Chesapeake's Methodology first require the application of 26 U.S.C. § 172(b)(1–2) to all non-Stimulus ATNOLs. *See* **Ex. 1**, Closing Agreement at Exhibit 1. The result of this is that all non-Stimulus ATNOLs are carried to the earliest year in which they can be utilized and are used to offset AMTI, to the extent permitted under the law. Rule 3 then requires the application of Rules 1 and 2 to the Stimulus ATNOLs to offset any remaining AMTI, if and to the extent any remains. *Id.* Rule 4 then provides that Rules 1–3 would be "applied anew" to account for amended returns or new carryovers. *Id.* Rule 4 makes it clear that after the utilization of a Stimulus ATNOLs in one year, such Stimulus ATNOLs can be recycled when a future carryback of a non-Stimulus ATNOLs replaces them. To the extent that AMTI in a given year was originally offset by a Stimulus ATNOL, and then subsequently replaced with later year non-ATNOLs carrybacks, Rules 1 and 2 would still require that the non-Stimulus ATNOLs being replaced were utilized for the time period before the creation of the Stimulus ATNOLs replacing them. This is important because utilization in this manner would reduce the amount subject to interest under even the IRS's Improper Interest Calculation Construct.

The IRS's Methodology similarly doesn't permit available ATNOLs to go unutilized. Rule 1 of the IRS's Methodology provides that "[a]ll unabsorbed ATNOLs are carried forward or back into the relevant tax year according to the rules set forth in section 172(b)(1)." **Ex. 1**, Closing Agreement at Exhibit 2. Rule 2 provides that all unabsorbed AMT NOLs, including the Stimulus AMT NOLs, are to be absorbed in accordance with 26 U.S.C. § 172(b)(2). *Id.* There are no further statements which change the operations of the NOL rules in the IRS's Methodology. As provided above, 26 U.S.C. § 172(b)(1–2) required the utilization of available NOLs in the earliest tax year in which they can be utilized. Although the IRS position table on Schedule A doesn't reflect the carry forward of any Stimulus AMT NOLs into 2014, the IRS's Methodology would nonetheless require the utilization of any ATNOLs that were available (Stimulus ATNOLs or non-Stimulus ATNOLs).

Even though both Parties' methodologies required the use of all available ATNOLs, the IRS's Improper Interest Calculation Construct does not account for all of the ATNOLs that were available in the 2012 tax year. The Per Mediation table on Schedule A (**Ex. 1**, Closing Agreement at Schedule A) reflects $105,261,142 (G) of available Stimulus ATNOLs that were derived solely from Chesapeake's Methodology. Because these Stimulus ATNOLs were derived solely from Chesapeake's Methodology, it is clear that at the very least 75% (arguably 100%) of these would be required to be initially utilized and then later recycled when the $1,509,427,461 of 2013 ATNOL carrybacks (D) were deemed to be created. If the IRS's Improper Interest Construct was correct, Example #2 on **Ex. 6**

displays how the rules in the Settlement Documents would require the calculation of interest and why the IRS's interest calculations are incorrect under even its improper construct. As reflected on Example #2 under the Corrected Calculation Assuming the IRS's Improper Interest Calculation Construct, $221,146,938 of Stimulus ATNOL would be initially utilized and then later recycled.[15]

If neither the IRS's Methodology nor Chesapeake's Methodology allows for ATNOLs to remain unutilized, how then can the numbers from the Schedules be deemed to reflect the proper base for calculating interest under even the IRS's Improper Interest Calculation Construct? It's impossible to reconcile the IRS's use of only these numbers from the Schedules and the language in the Closing Agreement. If the rules work as the IRS applied them, there would have been no need for the Closing Agreement in the first instance. The Closing Agreement was needed to derive a single deficiency amount.

The IRS's Improper Interest Construct clearly ignores the fact that the Parties agreed to calculate interest on the Deficiency only. The conflict discussed above provides further support that the IRS's Improper Interest Calculation Construct is simply wrong. The rules agreed to by the Parties were only intended to apply for purposes of calculating the ATNOLs that would be used to calculate the Deficiency and the Parties agreed to calculate interest on only the Deficiency. However, the irreconcilable conflict discussed above

---

[15] Example #2 further shows how the Stimulus ATNOL recycling required under Chesapeake's Methodology produces the end result reflected on the Per Mediation table of Schedule A and the end result reflected on Schedule B.

proves that it simply could not work in that manner or it would directly conflict with the Agreement reached by the Parties.

### c. The Schedules in the Form 3610 are Plainly Insufficient to Calculate Interest Under Even the IRS's Improper Interest Calculation Construct

Calculating interest as the IRS has done, using only numbers from the Schedules, can't be reconciled with the terms of the Settlement Documents. For the reasons discussed above, additional schedules like the corrected calculation in Example #2 on **Ex. 6** would be required to properly calculate interest under the IRS's Improper Interest Construct (*i.e.*, schedules showing the 2009 Stimulus ATNOLs being initially utilized to offset 2012 AMTI and then being replaced by 2013 non-Stimulus ATNOLs). Both Party's methodologies and the default rules under the tax code require the utilization of all available ATNOLs and, if viewed in a vacuum as the IRS did, the end result of the Schedules leaves Stimulus ATNOLs unutilized. The lack of these additional schedules is further evidence that the only way to calculate interest under the terms of the Settlement is on the single amount that is the Deficiency. Otherwise, the interest calculation would violate not only the terms of the Settlement Documents but also the general rules in the tax code.

### d. Chesapeake's Significant Concessions are Further Evidence of the Parties' Agreement to a Single Deficiency Amount with Interest on the Deficiency Amount and Finality for the Stimulus Provision Ordering Rule

Chesapeake's significant concessions with respect to the future benefits of its Stimulus ATNOLs is further evidence of the Parties' agreement that provided for finality with respect to the Stimulus Provision Ordering Rule and a single deficiency amount with interest only on that amount. As evidenced by the Settlement Documents, the Parties came

to a single amount that both Parties would accept, *i.e.,* the Deficiency, but that, alone, wouldn't provide finality with respect to the ATNOL Issue. To reach agreement with the IRS, Chesapeake conceded in the Closing Agreement that the additional benefits of its remaining Stimulus ATNOLs would be eliminated for future tax years (*i.e.*, the ability to offset 100% of AMTI and the ability for Stimulus ATNOLs to be recycled as a result of future non-Stimulus ATNOL carrybacks). UMF No. 17. This was the trade for finality.

This came at a steep cost to Chesapeake: it effectively agreed to transform $50 million of Stimulus ATNOLs (able to offset 100% of AMTI) into $50 million of ATNOLs (able to offset only 90% of AMTI). UMF No. 17. Stated differently, Chesapeake effectively agreed to incur a potential additional $10 million of AMT. *Id.* Chesapeake made this concession as part of the Parties' agreement to a final solution to complex issues. The Parties agreed to a solution that provided for finality with respect to the Stimulus Provision Ordering Rule, a single deficiency amount, with interest applying to only this Deficiency amount ($7,466,599).

## CONCLUSION

For the reasons stated herein, Chesapeake should be granted a refund of $12,644,769, plus interest from the date of payment, as a result of the IRS's erroneous interest assessments issued in violation of the Settlement.[16]

---

[16] Even if the IRS's position were correct (it isn't), the IRS incorrectly computed the amount of interest owed under the IRS's interpretation. *See* Doc. 1 at 13–14 (Count II). Should the Court determine interest should be computed in the manner advanced by the IRS, Chesapeake reserves all rights with respect to Count II.

Respectfully submitted,

/s/ *Reagan E. Bradford*
Reagan E. Bradford, OBA #22072
Ryan K. Wilson, OBA #33306
BRADFORD & WILSON PLLC
431 W. Main Street, Suite D
Oklahoma City, OK 73102
(405) 698-2770
(405) 234-5506 (fax)
reagan@bradwil.com
ryan@bradwil.com

*-and-*

/s/ *Richard A. Husseini*
Richard A. Husseini
KIRKLAND & ELLIS LLP
609 Main Street
Telephone: (713) 836-3457
Facsimile: (713) 836-3601
Email: richard.husseini@kirkland.com
*Admitted Pro Hac Vice*
Houston, Texas 77002

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2022, a true and correct copy of the above and foregoing document was served in accordance with the Local Rules on all counsel of record *via* the Court's electronic filing system.

/s/ *Reagan E. Bradford*
Reagan E. Bradford