## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Chesapeake Energy Corporation, | |
| Plaintiff, | |
| v. | Case No. CIV-20-934-J |
| The United States of America, | |
| Defendant. | |

## PLAINTIFF CHESAPEAKE ENERGY CORPORATION'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT & BRIEF IN SUPPORT

Agreements have consequences: when parties reduce their agreements to writing, those written words must control. Here, Chesapeake merely asks that Defendant be held to the agreement it made, as reflected in written settlement documents it signed.

Defendant purports to agree that the Court should resolve this case only on the four corners of written settlement documents executed by the parties. Despite paying lip service to this standard, however, Defendant then proceeds to base its argument on blatant parol evidence in the form of an IRS employee's statements on the settlement documents and her legal interpretation of what technical tax terms mean. *See* Doc. 26-1, Decl. of Sharon G. Johnson. The Court should ignore Ms. Johnson's views on what she thought the agreement said (or, perhaps, what she wishes it had said) and her view on what the tax law is (or, perhaps, what she wishes it was).

Put simply, Defendant advocates for application of a provision—Section 6601(d)—that simply cannot apply on the facts of this case, which inextricably involve application of the unique Stimulus Provision Ordering Rule.[1] Following Defendant's lead would not only require this Court to ignore the Settlement Documents but would also require this Court to sign off on violations of other tax provisions. Because the Court must follow the parties' agreement, and because the Court must construe that agreement to harmonize with other tax laws, Chesapeake respectfully requests that the Court grant it summary judgment.

## RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Undisputed.

2.     Undisputed.

3.     Undisputed.

4.     Undisputed.

5.     Undisputed.

6.     Undisputed.

7.     Undisputed.

8.     Undisputed.

9.     Undisputed.

10.     Disputed. Chesapeake signed the Form 870-AD at the same time it signed the Closing Agreement. Form 3610 did not dictate amounts for the Closing Agreement.

---

[1] Capitalized terms not defined herein have the same meaning as in Chesapeake's motion for summary judgment.

2

Rather, the Closing Agreement by its terms set forth the computational methodology. *See* Doc. 27-1.

11.     Disputed. The "PAM Audit Statement" is not a document signed by the parties. As such, there was no occasion for Chesapeake to agree to such document.

12.     Disputed. The deficiency agreed to by the parties was computed solely by reference to the Closing Agreement and documented on Form 870-AD. No other document was signed and agreed to by Chesapeake.

13.     Disputed. Chesapeake's deficiency was computed solely by reference to the Closing Agreement and documented on Form 870-AD.

14.     Disputed. Chesapeake agrees that the excerpt appears in the identified document but disagrees it has the meaning attributed to it by Defendant.

15.     Disputed. Chesapeake signed Form 870-AD to reflect the terms of the settlement reached with Defendant. As is clear from the face of the document, the Form 870-AD is Defendant's form, not an offer document made by Chesapeake.

16.     Disputed. The tax deficiency was computed by reference to the Closing Agreement.

17.     Undisputed.

18.     Undisputed.

19.     Disputed. By its terms Section 6601(d)(1) did not apply to Chesapeake's fact pattern. Section 6601(a) did apply by its terms.

20.     Disputed. Though Chesapeake doesn't dispute that Defendant took this action, Chesapeake submits that such action was taken in error and is the underlying issue in dispute in this case.

21.     Disputed. Chesapeake agrees that Defendant took the actions stated in this finding but disagrees that such actions should have been taken.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed.

Declaration of Sharon G. Johnson. Disputed. Ms. Johnson's declaration introduces parol evidence as to her view of what the Settlement Documents mean, how they should be interpreted, and legal interpretations of certain tax terms, including "restricted interest." Ms. Johnson is not being offered as an expert witness, and as such, may not offer expert testimony. Ms. Johnson similarly may not offer legal interpretations of tax concepts, including her understanding of restricted interest. Those matters are solely for this Court to decide. At a minimum, paragraphs 10–15 of her declaration should not be considered by the Court.

## SUMMARY OF ARGUMENT

The parties agree that the terms of the signed, written settlement agreements must govern. Here, that boils down to two signed documents: the Closing Agreement and the Form 870-AD (the "Settlement Documents"). Doc. 27, UMF No. 13. The parties signed no other agreements, and Defendant doesn't state otherwise. Accordingly, the Court must analyze those two documents, and the Court should ignore the parol evidence now offered by Defendant.

As the Court will see in those two documents, the underlying tax dispute concerned the settlement of the unique Stimulus Provision Ordering Rule—a context in which Defendant's argument simply cannot stand. Because of the unique ATNOL issues, this was not the customary instance in which net operating losses and net operating loss carrybacks follow as a matter of arithmetic once income and loss amounts are agreed to for a given tax year. Stated differently, it wasn't possible here to simply adjust income and loss to arrive at the Deficiency amount. Unique issues require unique solutions, and thus the parties devised and agreed upon a complex computation to create an artificial construct (*i.e.*, the "plug") to then use as the Deficiency amount.[2] Contrary to Defendant's suggestions now, this agreed-upon Deficiency didn't result simply from agreed changes to income or loss. Doc. 27, UMF No. 13.

---

[2] As additional evidence of the unique aspects of the Settlement, Defendant agreed to further forego the additional benefits of the Stimulus ATNOLs in the Closing Agreement. UMF No. 17.

Defendant would have the Court ignore all of these unique facts and instead treat this like any other run-of-the-mill tax dispute subject to Section 6601(d). But this square peg doesn't fit that round hole: by its own terms, Section 6601(d) cannot apply here. Nor did the parties agree, as Defendant suggests, that "restricted interest" under Section 6601(d) applied to the Deficiency. Defendant roots that argument on Form 3610, which was neither signed by the parties nor incorporated into Settlement Documents. Accordingly, under Defendant's own four-corners theory of construction, this document has no bearing on the parties' agreement. *See* Doc. 26 at 9, 12.

Even if the Court were to consider Form 3610, however, Defendant misinterprets that document, specifically as to the meaning of "restricted interest." As an initial matter, both parties agree that "restricted interest" applies here, but they vehemently disagree over what that term means in this context. Defendant points to no actual authority for the definition of "restricted interest" and chose not to tell the Court that the IRS's own manual includes a definition of "restricted interest," which is irreconcilable with Defendant's litigation stance here. Instead of discussing this definition (much less mentioning it), Defendant chose instead to rely on the declaration testimony of Ms. Johnson, an IRS employee who purports to tell the Court what "restricted interest" means. Doc. 26-1 at 4, ¶ 15. Of course, witnesses cannot opine on the meaning of tax law: that task remains solely within the province of the Court. The Court should disregard Ms. Johnson's declaration testimony, which is impermissible parol evidence and which impermissibly attempts to opine on the law. The decisional authority offered by Defendant fares no better: it is Defendant—not

Chesapeake—who is trying to introduce parol evidence beyond the Settlement Documents, and the federal common law on which Defendant purports to rely only undercuts its stance.

Under the only reasonable construction of the Settlement Documents, Chesapeake is entitled to summary judgment.

## ARGUMENT & AUTHORITY

### 1.    The Settlement Documents Require Chesapeake to Pay Interest "Required by Law"—Nothing More

Both parties agree that Form 870-AD states that Chesapeake owes "interest payable by law." Doc. 26 at 14. The dispute, then, turns on the meaning of that phrase. Defendant argues that "interest payable by law" means that Section 6601**(d)** applies. As explained *infra*, because of the unique nature of how the Stimulus Provision Ordering Rule was settled, this result simply cannot follow. Rather, Section 6601**(a)** is the applicable Code section on which interest is computed.

### 2.    Section 6601(d) Does Not Apply

As Chesapeake detailed in its opening brief, Section 6601(d) cannot apply to this case because of the unique nature of the Stimulus Provision Ordering Rule and how the parties settled their dispute. *See* Doc. 27 at 11–14; 21–23. Section 6601(d) provides:

> If the amount of any tax imposed by subtitle A is reduced by reason of a carryback of a net operating loss or net capital loss, such reduction in tax shall not affect the computation of interest under this section for the period ending with the filing date for the taxable year in which the net operating loss or net capital loss arises.

26 U.S.C. § 6601(d)(1). To apply this section, one must know (1) the amount of underpayment to which interest applies and (2) the amount of net operating loss to be carried back.

Recall that, under the Stimulus Provision Ordering Rule, the amount of the under-payment, or the "gross deficiency," is taxable AMTI after accounting for ATNOL carryfor-ward (both Stimulus and non-Stimulus) but before accounting for any ATNOL carrybacks. As a result of the Stimulus Provision Ordering Rule, the amount of the 2012 gross deficiency can't be known at the end of the first year (2012) because of the order of absorption (buckets) and recycling. *See* Doc. 27 at 11–14. Because those requisite inputs were unknowable and not agreed to under the Settlement, Section 6601(d) couldn't be applied. And that dilemma is precisely why the parties entered into the complex computation methodology in the Closing Agreement to arrive at an artificial plug amount for the Deficiency. *Id.* at 15–20.[3] Put simply, the operation of the Stimulus Provision Ordering Rule here precluded application of Section 6601(d).

Defendant nonetheless tries to shoehorn these unique facts into Section 6601(d). In so arguing, Defendant asks this Court to suspend reality and act as if the parties agreed to a gross deficiency amount and a carryback amount to offset it. **But the parties reached no such agreement**: they never agreed to underlying adjustments to income and loss to result in an agreed gross deficiency for one year that is offset by an agreed carryback from a subsequent year. Doc. 27 at 15, 19. The entire dispute between the parties on the underlying ATNOL issue was because they could *not* come to agreement on these basic points before IRS Appeals. Had the parties reached such an agreement, there would've been no reason

---

[3] Specifically, the Closing Agreement's methodology took 75% of the outcome from Chesapeake's methodology and 25% from Defendant's methodology to arrive at an artificially determined plug—the Deficiency. Doc. 27-1.

to adopt the complex computation to derive the artificial plug. Again, Section 6601(d) cannot apply where—as here—the required inputs are missing and aren't agreed.

Further still, in erroneously advocating that the Court apply Section 6601(d), Defendant effectively requires this Court to ignore another provision of the Internal Revenue Code: Section 172. Adopting Defendant's approach would require the Court to endorse a violation of Section 172 and the rules by which NOLs are to be utilized. Chesapeake described at length in its opening brief how such a violation of Section 172 is unavoidable under Defendant's argument. Doc. 27 at 23–29. To summarize here, by leaving Stimulus ATNOLs unutilized going into 2014, Defendant turns a blind eye to Section 172 and the methodologies agreed upon by the parties in the Closing Agreement. *See id*. Chesapeake's interpretation of the Settlement Documents doesn't require violating Section 172, and this Court should adopt the interpretation that harmonizes not only with the Settlement Documents but also with existing law.

**3.      Form 3610 Wasn't Signed by Either Party and Doesn't Bind Chesapeake**

Contrary to Defendant's suggestion, Form 3610 wasn't signed by either party, let alone *both* parties. *See, e.g.,* Doc. 26 at 3. Rather, Form 3610 was a document created by the IRS—it isn't part of the Closing Agreement or the Form 870-AD. Accordingly, the Court needn't consider it in construing the Settlement Documents.

Consider Defendant's own words on this point:

> In addition, if the terms of a closing agreement are clear and unambiguous then, as a matter of law, a court must enforce them as written and disregard any extrinsic (parol evidence). *Vail Resorts, Inc. v. United States*, 2011 WL 26214612 at *5 (D. Colo. 2011). Closing agreements are thus treated as fully integrated contracts. *Id.*

9

Doc. 26 at 9. Thus, even Defendant agrees it's improper to rely on Form 3610, as it's not part of the Closing Agreement or the Form 870-AD signed by the parties. On the same reasoning, so too should the Court ignore Ms. Johnson's declaration, as it's beyond the four corners of the Settlement Documents.

**4.    Even if the Court Were to Consider Form 3610, Defendant Grossly Misinterprets It**

Even if the Court were to consider Form 3610—which it shouldn't—that document doesn't support Defendant's position. Defendant attempts to wield Form 3610 as establishing that "restricted interest" means interest must be computed under Section 6601(d). But Defendant never comes close to connecting those dots. Defendant begins by pointing out that "restricted interest" is not defined in the Internal Revenue Code or the Treasury Regulations. Doc. 26 at 11. Although Chesapeake agrees that neither the Internal Revenue Code nor the Treasury Regulations provide a definition, Defendant fails to point out that the IRS *does* define "restricted interest" in its own publication, the Internal Revenue Manual. And that definition undercuts Defendant's position here:

> (2) Interest may be limited to specific time periods or rates, or it may be statutorily prohibited. This gives rise to the term "restricted interest." There are two reasons why interest is restricted:
>
> > (a) Conditions may exist that prevent the computer from generating an accurate amount; and
> >
> > (b) Special provisions in law limit or prohibit interest. (See IRM 20.2.8.6, *Reasons for Restriction*, for more information.).

*IRS*, INTERNAL REVENUE MANUAL 8.17.6.1, available at: https://bit.ly/3wCCJcF (last visited May 19, 2022). Chesapeake submits that this definition applies here because, as described *supra*, the Stimulus Provision Ordering Rule presents a special provision in law that precludes the normal computation of interest.

Of course, "restricted interest" can mean many different things in many different contexts of the Internal Revenue Code, as Chesapeake noted in its opening brief. Doc. 27 at 21–23. And Chesapeake appreciates that if the Stimulus Provision Ordering Rule weren't at play here, a carryback would exist that would reduce a prior year's income. In that circumstance, there would be no dispute but that Section 6601(d) applied. But that's *not* this case, and no one disputes that the Stimulus Provision Ordering Rule applied and a complex settlement of how it applied was reached in the Closing Agreement. Because that unique provision applied, the parties created a novel manner in which to compute the Deficiency under the mechanics of the Closing Agreement.

Attempting to sidestep this issue, Defendant relies on caselaw to suggest that "restricted interest" *can* be understood to refer to Section 6601(d) interest. Doc. 26 at 11. While Chesapeake agrees (and even noted as much in its opening brief, Doc. 27 at 21), Defendant fails to appreciate that, in each case on which it relies, no party disputed whether the factual predicates for Section 6601(d) existed. Quite to the contrary, in each of those cases, the parties agreed to the amount of the (i) "gross" deficiency before application of a carryback and the (ii) amount of the carryback that reduced such deficiency. Not so here—those factual predicates are missing in this case. Defendant has pointed to no authority that

Section 6601(d) can apply, or has been applied, to disputes like this one that involve the settlement of a dispute of the Stimulus Provision Ordering Rule.

Defendant cites other authorities in which the taxpayer tried to avoid restricted interest either because the Closing Agreement did not reference it, because the taxpayer argued that restricted interest had been waived, or because there was a side agreement not written down between the parties. *See, e.g.*, *In re Spendthrift Farm, Inc.*, 931 F.2d 405 (6th Cir. 1991). Chesapeake makes none of those arguments here. Similarly, Chesapeake isn't relying on any res judicata principles (*see, e.g., United States v. Beane*, 841 F.3d 1273 (11th Cir. 2016)) nor is it arguing for the application of the Tax Anti-Injunction Act to say that the mere fact the Form 870-AD doesn't refer to restricted interest means it cannot apply (*see, e.g. DecisionOne Holdings Corp. v. United States*, No. 96–206T, 1996 WL 773320, at \*1–2 (Fed. Cl. Dec. 3, 1996)). Finally, Chesapeake isn't arguing restricted interest doesn't apply because no one told them it could apply. *See, e.g., Urbano v. Comm'r*, 122 T.C. 384, 393–94 (T.C. 2004). None of these authorities offered by Defendant rebut the arguments Chesapeake is actually making.

Finding no support in caselaw for its proposed meaning of "restricted interest," Defendant then pivots to declaration testimony from an IRS employee who states *her* view of what "restricted interest" means. *See* Doc. 26-1. This is parol evidence, plain and simple, because there is no ambiguity in the Settlement Documents. *U.S. v. Donovan*, 348 F.3d 509 (6th Cir. 2003) (finding error for a court to discern intent of parties through extrinsic evidence). And even if there were ambiguity, it is axiomatic that "lay witnesses and even expert witnesses are not permitted to give opinions as to what the law is." *United States v.*

12

*Kingston*, 971 F.2d 481, 486 (10th Cir. 1992); *see also Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988). The Court should disregard this testimony.

At the end of the day, if Defendant truly believed Section 6601(d) applied, Defendant could've easily written "Section 6601(d)" instead of "restricted interest" on Form 3610. But it didn't. Of course, Defendant knew Chesapeake never would've agreed to the amount of the "gross" deficiency in 2012 or the carryback amount from 2013 to 2012—*i.e.*, the factual predicates necessary for Section 6601(d) to apply. Defendant can't now achieve through the back door what it couldn't achieve through the front door.

**6.    The Court Shouldn't Fall for Defendant's Dangerous Oversimplification of This Case**

Defendant tries to avoid the complexity of this case by ignoring the Stimulus Provision Ordering Rule altogether. Undoubtedly, the Stimulus Provision Ordering Rule is complex and can be difficult to understand. For this reason, Chesapeake devoted considerable ink to explaining that issue in its opening brief. Once that rule is understood, however, there's no doubt that Chesapeake is entitled to summary judgment.

Defendant far oversimplifies the facts, resulting in a false narrative that goes like this: *the parties agreed to a gross deficiency for 2012 that was reduced by a carryback from 2013 to produce the Deficiency listed on the Form 870-AD—in those circumstances, Section 6601(d) applies to compute interest.* This is wrong. Chesapeake and Defendant did *not* agree on a gross deficiency for 2012 and they did *not* agree on a final carryback amount to carry back from 2013 to 2012. Absent those two critical data inputs, Section 6601(d)

13

cannot apply. Thus, Section 6601(a) is the operative provision under which to compute interest.

## CONCLUSION

For all these reasons, Chesapeake respectfully requests that the Court grant it summary judgment, entitling Chesapeake to a refund of $12,644,769, plus interest from the date of payment, as a result of the IRS's erroneous interest assessments issued in violation of the Settlement.[4]

Respectfully submitted,

/s/ *Reagan E. Bradford*
Reagan E. Bradford, OBA #22072
Ryan K. Wilson, OBA #33306
BRADFORD & WILSON PLLC
431 W. Main Street, Suite D
Oklahoma City, OK 73102
(405) 698-2770
(405) 234-5506 (fax)
reagan@bradwil.com
ryan@bradwil.com

–and–

/s/ *Richard A. Husseini*
Richard A. Husseini, *pro hac vice*
KIRKLAND & ELLIS LLP
609 Main Street
(713) 836-3457
(713) 836-3601 (fax)
richard.husseini@kirkland.com

---

[4] As also noted in Chesapeake's Opening Brief, even if the IRS's position were correct (it isn't), IRS incorrectly computed the amount of interest owed under the IRS's interpretation. *See* Doc. 1 at 13–14 (Count II). Should the Court determine interest should be computed in the manner advanced by the IRS, Chesapeake reserves all rights with respect to Count II. Defendant implicitly concedes this point by only moving on summary judgment on Count I.

Houston, Texas 77002

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2022, a true and correct copy of the above and foregoing document was served in accordance with the Local Rules on all counsel of record *via* the Court's electronic filing system.

*/s/ Reagan E. Bradford*
Reagan E. Bradford